UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-20770-CR-HUCK

UNITED STATES OF AMERICA,

    Plaintiff,

Vs.

LACAROL DENT,

    Defendant.

_____/

## DEFENDANT'S MOTION TO FOR BOND

COMES NOW, the Defendant, LACAROL DENT, through counsel and files this Motion for Bond and respectfully requests this Court set hearing on this motion via video. In support thereof, it is stated as follows:

1. Ms. Dent was charged by indictment with one count of possession of a firearm and ammunition by a convicted felon. (DE 3).

2. On March 16, 2020, Ms. Dent appeared before the magistrate judge for first appearance and arraignment. The case was continued to March 17, 2020 for a pretrial detention hearing. (DE 10).

3. On March 17, 2020, Ms. Dent was released on a $100,000 personal surety bond with location monitoring at the discretion of the supervising officer and home detention with exceptions for medical, substance abuse and mental health treatment, attorney visits, employment, court appearances, religious services, and other activities as pre-approved by supervising officer. (DE 12).

4. On April 23, 2020, the Department of Probation filed a request for a warrant and alleged that Ms. Dent failed to comply with the conditions of release. (DE 17). On April 24, 2020, this Court signed the request for a warrant. (DE 17). On May 2, 2020, Ms. Dent was arrested on the outstanding warrant.

5. Ms. Dent has not requested bond review since she was arrested on the warrant on May 2, 2020.

6. Counsel requests that this Court hold a bond review hearing via video and consider a bond for Ms. Dent due to (1) Ms. Dent's physical health conditions, which cannot be properly treated at FDC-Miami and which make her at-risk of severe illness if she were to contract COVID-19 and (2) Ms. Dent's mental health conditions, which are not being properly treated at FDC-Miami.

7. Further, if given the opportunity for release, Ms. Dent is willing to reside at a halfway house, which will provide additional structure and ensure she will succeed on pretrial release.

I. <u>Ms. Dent's physical health conditions</u>

Ms. Dent's health conditions include asthma, epilepsy seizure disorder, and iron deficiency anemia. Additionally, Ms. Dent has suffered from continuous pelvic pain and dysmenorrhea (vaginal bleeding) since February 2020. (Medical records from FDC-Miami).[1] At FDC-Miami, Ms. Dent was prescribed an Albuterol Inhaler for her asthma. *Id*. Ms. Dent has been prescribed an inhaler since she was a child. However,

---

[1] On July 17, 2020, counsel provided a copy of Ms. Dent's medical records to AUSA Karin Bhat and Court Room Deputy Michael Brenner via email.

2

in addition to the inhaler, she uses a nebulizer at home to control her asthma symptoms (coughing, wheezing, shortness of breath, chest tightness, pain or pressure) and for immediate relief from asthma attacks.[2] Ms. Dent does not have access to a nebulizer at FDC-Miami. As this Court is aware, according the Center for Disease Control (CDC), because of her asthma, Ms. Dent may be at an increased risk for severe illness from Covid-19.[3]

Indeed, courts have granted motions for reduction in sentence during COVID-19 based on the fact that a defendant suffers from asthma. See: *United States v. Brown*, Case No. 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020); *United States v. Gorai*, 2020 WL 1975372, at *3 (D.Nev., Apr. 24, 2020) (granting motion for reduction after finding "defendant's asthma falls squarely within the ambit of preexisting conditions that the CDC has unambiguously explained place him at greater risk of COVID-19"); *United States v. Norris*, No. 3:18-cr-243, No. 37 (D. Conn., Apr. 16, 2020) (granting reduction where only risk factor identified was asthma: "[Defendant] suffers from asthma and uses an Albuterol inhaler to treat his symptoms. . . . [H]is medical condition and current conditions of confinement constitute extraordinary and compelling reasons to reduce his sentence." (emphasis supplied); *United States v. Wen*, 2020 WL 1845104 (W.D.N.Y., Apr. 13, 2020) (granting reduction for 48-year old defendant where only risk factor was history of asthma; noting possible positive case at institution) (emphasis supplied); *United States v. Tran*, 2020 WL 1820520 (C.D.

---

[2] https://www.webmd.com/asthma/guide/home-nebulizer-therapy#1-3
[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

Cal., Apr. 10, 2020) (granting reduction for defendant serving a 15 year sentence for Hobbs Act robbery and possession of a machine gun where defendant suffered from asthma since childhood and was housed in a facility with an active COVID-19 outbreak); *United States v. Hernandez*, ___ F.Supp.3d ___, 2020 WL 1684062, at *3 (S.D.N.Y., Apr. 2, 2020) (granting reduction based on CDC guidance that persons with asthma are at high risk of serious illness if they contract the disease); *United States v. Gentille*, 2020 WL 1814158 (S.D.N.Y., Apr. 9, 2020) (same); *United States v. Lee*, ___ F.Supp.3d. ___, 2020 WL 2512415 2 (N.D.Cal., 2020) (granting reduction; noting the government did not dispute that moderate to severe asthma is a recognized risk factor); *United States v. Echevarria*, 2020 WL 2113604 (D.Conn., May 4, 2020) (granting reduction for 49-year old with history of asthma, though court noted other unidentified "chronic medical problems")

Further, the Department of Justice issued internal guidance which directs that the Government concede that Defendants who have certain CDC risk factors"…"can establish that 'extraordinary and compelling reasons' warrant the reduction in sentence." *United States v. Albert Firebaugh IV*, Case No.: 16-20341 (DE 43) (government's supplemental response). The factors listed by the government included asthma (moderate to severe) *Id*.

As the Court is also well aware, "prisons are epicenters for infectious diseases, [such as COVID-19], because of the higher background prevalence of infection, the higher levels of risk factors for infection, the unavoidable close contact in often overcrowded, poorly ventilated, and unsanitary facilities, and the poor access to

4

health-care services relative to that in community settings."[4]  The data exposes this reality. As of July 17, 2020, BOP reported that 8,853 inmates and 926 staff members have tested positive for COVID-19.[5] As of July 17, 2020, at FDC-Miami, 16 inmates and 22 staff members have tested positive for COVID-19; one inmate at FDC-Miami has died from COVID-19.[6] As of July 17, 2020, 95 inmates have died from COVID-19 while in BOP custody, and 1 staff member has died.[7] These numbers are likely deeply flawed given BOP's under-testing.[8] COVID-19 is present and spreading at FDC-Miami. It is a safe assumption that it is only a matter of time before Ms. Dent becomes infected with COVID-19.

Currently Ms. Dent shares a cell with another inmate. It is virtually impossible to socially distance. Ms. Dent is allowed out of her cell Monday through Friday for one hour each day. Ms. Dent must decide to whether use that hour to email her attorney; call her family; or shower. Ms. Dent is not allowed out of her cell on Saturdays or Sundays. She has been given two cloth face masks since her arrival at FDC-Miami. She has not been given hand sanitizer or gloves.

---

[4] Stuart A. Kinner *et al.*, *Prisons & custodial settings are part of a comprehensive response to COVID-19*, The Lancet, April 1, 2020, https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(20)30058-X/fulltext (last visited May 5, 2020).
[5] *See* Fed. Bureau of Prisons, COVID-19 Coronavirus, at https://www.bop.gov/coronavirus/
[6] *Id*.
[7] *Id*.
[8] See, e.g., FDC-Miami reporting it tested a mere two inmates as of May 8, 2020 and zero inmates the following week. https://www.flsd.uscourts.gov/sites/flsd/files/FDCMiamiMay082020Update.pdf and https://www.flsd.uscourts.gov/sites/FDC20200515COVIDReport.pdf

On July 13, 2020, counsel contacted the medical department at FDC-Miami because Ms. Dent reported that her Albuterol Inhaler was not working property. Staff had advised Ms. Dent to bang on the inhaler and run it under warm water. Counsel asked the medical department to provide Ms. Dent with a new inhaler. (Counsel's emails to the medical department of at FDC Miami.)[9] As of the writing of this motion, Ms. Dent has not received a new inhaler.

For her epilepsy seizure disorder Ms. Dent is prescribed carbamazepine. (Medical records). On May 29, 2020, her dosage of carbamazepine was increased from 200 mg twice a day to 300 mg twice a day. *Id.*

Finally, and most likely related her iron deficiency anemia, Ms. Dent has been suffering from dysmenorrhea and pelvic pain since February 2020. Ms. Dent reported the issue to the medical department during her first visit on May 5, 2020. Ms. Dent's heavy dysmenorrhea and pelvic pain are documented throughout the medical records.

The medical department noted that, as a result of the heavy bleeding, Ms. Dent received blood transfusion in April 2020 before she was incarcerated. Lab results from the medical department show that Ms. Dent's hemoglobin level (red blood cell count) is low, 8.0 g/dL. *Id*. According to the American Society of Anesthesiologists, a hemoglobin level of 6.0 g/dL is the trigger for a required blood transfusion.[10]

---

[9] On July 17, 2020, counsel provided a copy of the emails to the medical department at FDC-Miami to AUSA Kiran Bhat and Court Room Deputy Michael Brenner via email.
[10] https://www.medscape.com/answers/434176-183008/at-what-hemoglobin-level-is-a-transfusion-triggered#:~:text=The%20American%20Society%20of%20Anesthesiologists,particularly%20in%20renal%20transplant%20patients

According to the Mayo Clinic, a normal hemoglobin level for a woman is 12.0 g/dL to 15.15 g/dL.[11] Ms. Dent's level is well below the normal range.

On June 8, 2020, due to her low red blood cell count, the medical department prescribed Ms. Dent a 15 day supply of Ferrous Gluconate (iron pills) for her iron deficiency anemia. *Id.* On July 13, 2020, counsel advised the medical department that Ms. Dent may be in need of another supply of iron pills. (Emails). As of the writing of this motion, Ms. Dent has not received another supply.

Counsel also informed the medical department about Ms. Dent's continuous blood loss and associated complications. (Emails). Counsel offered to provide the medical department with pictures of Ms. Dent's previous medical records regarding this issue. (Emails). On May 8, 2020, counsel told the medical department that:

- <u>On February 16, 2020</u>, Ms. Dent's medical records indicate that there was a large hypoechoic structure (mass) intimately associated with the cervix. The records state that the appearance is suspicious for an infiltrative cervical malignancy (cancer). It was recommend that Ms. Dent have a direct examination, a colposcopy (cervix exam), and a gynecologic consultation.
- <u>On April 9, 2020</u>, Ms. Dent was diagnosed with anemia and vaginal bleeding by North Shore Medical Center. She was directed to follow up with a primary physician and told she must return if her symptoms worsened.
- <u>On April 28, 2020</u>, Ms. Dent went to Jackson Hospital and was informed that she may have fibroids on her uterus.

On June 16, 2020, Ms. Dent had a pelvic ultrasound. The results are alarming. The findings indicate that the ultrasound was "abnormal." (Medical records). The findings show endometrial thickening, which is thickening of the lining of the

---

[11] https://www.mayoclinic.org/tests-procedures/hemoglobin-test/about/pac-20385075#:~:text=The%20normal%20range%20for%20hemoglobin,to%2015.5%20grams%20per%20deciliter

uterus.[12] According to the American Cancer Society, endometrial thickening, abnormal vaginal bleeding, and pelvic pain can be a sign of endometrial cancer.[13] The findings note that a polyp cannot be excluded; polyps may be benign, cancerous, or lead to cancer.[14]

Ms. Dent also has a localized lesion on her uterine wall. The ultrasound results state that this could be a soft tissue mass or "perhaps intramural leiomyoma, etc." Leiomyoma is also known as uterine fibroids.[15] Symptoms of fibroids include pelvic pain and abnormal bleeding.[16] Surgery is recommended for fibroids that are causing bleeding and pelvic pain.[17]

Ms. Dent also has "what appears to be an ovarian cyst" measuring 2.2 to 2.4 centimeters (Medical records). That is between the size of peanut and a grape.[18] Cysts that are painful or do not go away are treated with hormone therapy medication or surgery.[19] The findings also state that neoplasm, which is new and abnormal tumor that can be benign or cancerous[20], cannot be excluded. (Medical records).

---

[12] https://www.medicalnewstoday.com/articles/327036
[13] https://www.cancer.org/cancer/endometrial-cancer/about.html
[14] https://www.mayoclinic.org/diseases-conditions/uterine-polyps/symptoms-causes/syc-20378709
[15] https://www.mayoclinic.org/diseases-conditions/uterine-fibroids/symptoms-causes/syc-20354288
[16] https://www.mayoclinic.org/diseases-conditions/uterine-fibroids/symptoms-causes/syc-20354288
[17] https://www.mayoclinic.org/tests-procedures/myomectomy/about/pac-20384710
[18] https://www.ncbi.nlm.nih.gov/books/NBK65847/figure/CDR0000257530__268/
[19] https://www.mayoclinic.org/diseases-conditions/ovarian-cysts/diagnosis-treatment/drc-20353411
[20] https://www.cancer.gov/publications/dictionaries/cancer-terms/def/neoplasm

No one from the medical department has explained the findings in the ultrasound to Ms. Dent. Ms. Dent feel helpless, and she is afraid. She knows the results are "abnormal," and she knows she is bleeding and in pain.

The ultrasound report recommends a transvaginal pelvic ultrasound examination and a CT examination of the pelvis with and without intravenous contrast, as well as with oral contrast media. As of the writing of this motion, Ms. Dent has not been told when or if the CT scans will occur. She has not been told if she will receive a transvaginal ultrasound.

Due to the pandemic, it is highly unlikely that Ms. Dent will be sent to a hospital to receive the CT scans, and even less likely that she would have surgery to remove the ovarian cyst or fibroids. As of this writing, Ms. Dent has not been prescribed any hormone medication for the ovarian cyst; though it is probable that the CT scans and ultrasound must occur before she can begin any treatment.

If Ms. Dent is released, she will receive the medical care she needs to effectively treat her chronic pelvic pain and bleeding. She will schedule any necessary surgeries to remove the cysts and fibroids. She can schedule the CT scans and ultrasound to determine if any of the growths or tumors are cancerous. Most importantly, Ms. Dent will be able to sit down with medical professionals and discuss her concerns about her health and her body.

Ms. Dent has Medicaid and has received treatment before at Jackson Memorial Hospital and North Shore Medical Center. Additionally, Ms. Dent's mother, who lives in New York, is a nurse and has worked in the medical field her entire life. If released,

Ms. Dent will be able talk to her mother and seek her guidance and advice as often as she likes.

Ms. Dent will also be able to better treat her asthma if she is released. She will bring her nebulizer, which is still at her previous address, to the halfway house. Ms. Dent will be significantly safer from contracting COVID-19 at a halfway house than inside a federal prison. At a halfway house, Ms. Dent can properly socially distance; shower regularly; and practice vigilant hygiene habits.

## II. Ms. Dent's mental health conditions

Ms. Dent suffers from bipolar disorder, major depressive disorder recurrent, and post-traumatic stress disorder. (Medical records). FDC-Miami noted Ms. Dent's mental health conditions during her visit with Psychology Services on May 5, 2020. *Id*. Psychology Services stated that, "prior mental health treatment was noted: outpatient counseling/psychotherapy and psychotropic medications." *Id*. Additionally, Ms. Dent reported a history of treatment with anxiolytics, (anti-anxiety medications) with beneficial results. *Id*. Ms. Dent also asked to continue her medication, Remeron, which is used to treat depression.[21] *Id*.

Despite the medical department's documentation of Ms. Dent's mental health conditions; Ms. Dent's report of previous medications and psychotherapy; and Ms. Dent's specific request for Remeron, the medical department made findings that "Ms. Dent did display, evidence, or report the need for frequent psychological intervention

---

[21] https://www.webmd.com/drugs/2/drug-13707/remeron-oral/details

nor does appear to require scheduled sessions with Psychology for management of her overall health care." (Medical records).

In stark contrast, when Ms. Dent was evaluated by Dade Family Counseling on April 17, 2020, Dade Family Counseling recommended she attend individualized therapy sessions twice a month and group therapy weekly. Dade Family Counseling diagnosed Ms. Dent with a personality disorder and a substance abuse disorder. (Violation Memorandum – Request for Petition and Warrant).

On May 19, 2020, undersigned counsel contacted the medical department via email and requested that Ms. Dent receive Remeron and Seroquel, for her depression and bipolar disorder[22], which are two medications she was prescribed before her incarceration. (Emails). On that same day, May 19, 2020, Ms. Dent's medical records indicate she was "referred to psychiatry." (Medical records). On June 8, 2020, the medical department again documented Ms. Dent's bipolar disorder and PTSD and stated "will refer to psychiatry" *Id.*

As of the writing of this motion, Ms. Dent has not been prescribed any anti-anxiety medication. Ms. Dent has not been prescribed Remeron, Seroquel, or any other medication for her bipolar disorder, major depressive disorder recurrent, and post-traumatic stress disorder. Ms. Dent has not seen a psychiatrist, psychologist, or received any therapy or counseling.

Ms. Dent is not getting the mental health treatment she needs at FDC-Miami. In light outbreak of COVID-19 in the BOP and at FDC-Miami, it will presumably be

---

[22] https://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details

even harder for FDC-Miami to give Ms. Dent the care she needs for her mental and physical heath. The staff is understandably prioritizing containment of the spread of COVID-19.

Even in the best of conditions, the burdens on the BOP to provide mental health care are significant. Mental health disorders among prisoners consistently exceed rates of the same disorders in the general population.[23] According to Bureau of Justice statistics, 50% of all inmates have a mental health condition.[24] Unfortunately, due to understaffing, budget restrictions, and lack of trained medical professionals,[25] Bureau of Prisons is not providing the level of care required for mentally ill inmates.

Despite nearly 50% of the inmate population needing mental health treatment, the Department of Justice Inspector General reported that only 24% of inmates received treatment.[26] The most common form of mental health treatment was

---

[23] Gonzalez et al., *Mental health of prisoners: Identifying barrier to mental health treatment & medication continuity*, 12 Am J. Public Health 104, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232131/#:~:text=1%E2%80%933%2 0Despite%20court%20mandates,health%20care%20has%20been%20sporadic. (last visited July 11, 2020).
[24] James et al., *Bureau of Justice Statistics: Mental Health Problems of Prison & Jail Inmates*, U.S. Dept. of Justice, Sept. 2006, last updated Dec. 2006, https://www.bjs.gov/content/pub/pdf/mhppji.pdf (last visited July 10, 2020).
[25] Gonzalez et al., *Mental health of prisoners: Identifying barrier to mental health treatment & medication continuity*, 12 Am J. Public Health 104, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232131/#:~:text=1%E2%80%933%2 0Despite%20court%20mandates,health%20care%20has%20been%20sporadic. (last visited July 11, 2020).
[26] James et al., *Bureau of Justice Statistics: Mental Health Problems of Prison & Jail Inmates* at Table 14.

medication.[27] Only 50% of inmates who were taking medication before admission to the Bureau received medication after beginning their sentence.[28] Further, a mere 15% of those needing care—like Ms. Dent—received "professional mental health therapy."[29]

As discussed, due to the pandemic, Ms. Dent is allowed out of her cell Monday through Friday for one hour each day. She is not allowed out of her cell on Saturday or Sunday. That is only five hours a week that Ms. Dent is not inside a prison cell. Ms. Dent has confessed that these draconian restrictions have exacerbated her anxiety, stress, and depression, along with the absence of her medication.

### III. Conditions of Release

If given the opportunity for release, Ms. Dent is willing to reside in a halfway house, where she will have much more structure than she did when she was first released on bond. She will also have the opportunity for mental health and substance abuse counseling, which she will not receive at FDC-Miami. Further, she can resume her much needed prescription medication for her mental health issues.

One thing that Ms. Dent did right away, as scheduled by the U.S. Probation Office, was undergo the evaluation with Dade Family Counseling. If released, Ms. Dent

---

[27] *Id.* at 9.
[28] Gonzalez et al., *Mental health of prisoners: Identifying barrier to mental health treatment & medication continuity*, 12 Am J. Public Health 104, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232131/#:~:text=1%E2%80%933%20Despite%20court%20mandates,health%20care%20has%20been%20sporadic. (last visited July 11, 2020).
[29] James et al., *Bureau of Justice Statistics: Mental Health Problems of Prison & Jail Inmates* at 9.

would begin the recommended treatment immediately, and get back on her medications, which can be conditions of her bond. Ms. Dent requests another opportunity to succeed on pretrial release, with the additional structure, so that she can protect her mental and physical health.

Undersigned counsel has conferred with AUSA Karin Bhat, who has no objection to a bond review hearing via video. As of the writing of this motion, Mr. Bhat objects to a bond.

WHEREFORE, the Defendant, LACAROL DENT, respectfully requests this Court set a bond review hearing via video for Ms. Dent.

                    MICHAEL CARUSO
                    FEDERAL PUBLIC DEFENDER

By:   */s/ **Ashley D. Kay***
      Assistant Federal Public Defender
      Florida Bar No.: 78991
      150 W. Flagler Street, Suite 1700
      Miami, Florida 33130-1556
      Tel: (305) 533-4236/Fax: (305) 536-4559
      E-mail: Ashley_kay@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on July 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document was served this day on all counsel of record or *pro se* parties identified in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                    */s/ **Ashley D. Kay***